MYRTLE RAUCH, appellee, v. AMERICAN RADIATOR & STANDARD SANITARY CORPORATION, appellant, CY-GAS COMPANY, a corporation, et al., defendants-appellees, and TEXAS NATURAL GASOLINE CORPORATION, cross-defendant and appellee.

No. 50037.

(Reported in 104 N.W.2d 607)

AUGUST 2, 1960.

REHEARING DENIED OCTOBER 21, 1960.

•Stillwill & Wilson, of Sioux City, for appellant.

Bruce A. Crary and W. W. Huff, both of Sioux City, for appellee Myrtle Rauch.

Sifford & Wadden, of Sioux City, for appellee Cy-Gas Company.

Shull, Marshall, Mayne, Marks & Vizintos, of Sioux City, and Herbert W. Bails, of Sloan, for appellees Maurice Longval and Harry Longval, d/b/a Longval Bros. Hardware.

Whicher & Davis, of Sioux City, for appellee Leo Beeson.

Shull, Marshall, Mayne, Marks & Vizintos, of Sioux City, for appellee Wigman Company.

4

Hutchison, Hurst & Duggan, of Sioux City, for appellee Edmund J. Senecal, d/b/a Senecal Lumber Company.

Harper, Gleysteen & Nelson, of Sioux City, for appellee Texas Natural Gasoline Corporation.

GARRETT, J.—This is a law action in which plaintiff, Myrtle Rauch, sought to recover damages on account of injuries sustained by her when gas which escaped from a defective water heater exploded. The plaintiff, hereinafter referred to as appellee, and her husband rented and on June 30, 1957, moved into the Lee Beeson property in Salix, Iowa. Appellee alleged the explosion was caused by the malfunctioning of the safety pilot valve on the Beeson heater manufactured by appellant, American Radiator & Standard Sanitary Corporation. The safety pilot valve involved was manufactured by Titan Valve & Manufacturing Company, and was placed on the heater some ten months after the heater was originally sold and installed. It was purchased by the local dealer from appellant's distributor who had purchased it from appellant and placed it in its stock.

Defendant's motions for directed verdict, to dismiss, to withdraw certain issues, for judgment notwithstanding the verdict and for new trial were overruled. Defendant appeals on five grounds: (1) That it was neither the manufacturer nor did it stand in position of manufacturer but was only an intermediary seller and as such had no duty to inspect the valve; (2) that said valve was sold merely for inclusion in distributor's stock and not as a replacement of the original valve on the heater; (3) that the jury should have been instructed that the defendant had a right to rely upon the manufacturer of the valve for any inspection or tests; (4) that the jury should have been instructed that the use of the valve for approximately five years without mishap might be considered as evidence that the valve was in proper and safe working condition; (5) that the verdict was excessive and appeared to have been influenced by passion and prejudice.

The Beeson house was equipped with liquid petroleum or bottle gas which was turned off before Beeson left it. On July 1, Mrs. Rauch called Harry Longval, the local gas supplier,

who came that evening and hooked up the stove and adjusted it for LP gas, turned on the gas and lit the hot-water heater in the basement. Mrs. Rauch used the hot water that evening but the next morning the water was cold so she went to the basement to see what was wrong. The basement had no connection or opening into the upper part of the house, and was entered by steps from the outside, the door at the bottom of which opened inward. The steps were enclosed by a trap door. Mrs. Rauch descended the steps, took a few steps into the basement, turned around and turned on the light switch which was to the right of the door where she entered. There was an explosion and she was severely burned. The explosion was of considerable force, causing damage to the walls in the upper portion of the house and causing cracks in and pushing out of the foundation. The deputy state fire marshal reached the conclusion the explosion was caused by the faulty operation of the gas water heater.

The heater was examined later and tested at Morningside College on November 1, 1958, by Professor Lee L. Amidon, who appeared as an expert witness for plaintiff.

The tanks or bottles containing the odorized gas were located outside the house and carried to the heater by copper pipes or tubing. The flow of gas to the burner in the heater was first controlled by a thermostatic control which opened a valve permitting gas to enter the heater when the water in the tank of the heater was reduced or cooled to a set or fixed temperature, and was also controlled by a safety pilot valve or unit to which was attached a pilot light which lit the burner of the heater when gas was supplied to it. The purpose of this valve was to shut off the flow of gas in the event the pilot light was out so that the burner would not light. Inside the valve is enclosed a thermal tube of quartz, the length of which is altered by expansion or contraction through temperature change and this change of length acts upon a magnet, which, by action of a spring, serves to open or close a valve regulating the flow of gas to the burner in the heater. Thus when the pilot light is on, the quartz rod is heated and expands, opening the valve, but if the pilot light is off, it contracts, closing the

valve so that gas cannot escape through the burner of the heater. The length or position of the rod must be adjusted so that action upon the magnet will readily open and close the valve and this is accomplished by turning the thermal tube. It was found by Professor Amidon's examination that the safety pilot valve would remain open after the pilot light was extinguished and after the rod had cooled, thus permitting gas to flow into the burner when the pilot light was not on, and it was the opinion of Professor Amidon that this maloperation of the safety valve of the heater was caused by the maladjustment of the thermal tube in the safety pilot unit. This was known in the testimony as "miscalibration" and Professor Amidon was of the opinion the miscalibration occurred before the valve left the factory of the Titan Valve & Manufacturing Company, its manufacturer, and continued to the time of the explosion and that if so the safety valve would not have worked at any time. He also testified that if, upon tests, the valve worked at any time within the period before the explosion, that would show it was properly calibrated and that it was not then defective and his opinion would be different.

Beeson would use a match to light the heater, placing it inside the heater, getting down on the floor, squatting on his knee. There was never a time during the fifty or sixty times he lit the heater that he smelled gas, nor did he ever notice any "whoosh" or any pop as though there was gas at or around the heater. The water heater was an American Standard Budget type heater sold by appellant. It was purchased by Beeson from Senecal, a local dealer, in February 1952, who purchased it from Wigman Company, who purchased it from appellant. Wigman Company was a plumbing and heating wholesaler and did not sell at retail. The water heater was made by American Radiator & Standard Sanitary Corporation through assembly of various parts, including the safety pilot valve procured from other manufacturers and was placed upon the market under the name of American Radiator & Standard Sanitary Corporation. In December 1952 Beeson had some difficulty with the heater and called Senecal, who came and put in the pilot control valve involved here and it worked all right for approximately five

years. The purchasing agent for Wigman Company testified the valve may have come from Titan in Cleveland or it may have come from Buffalo plant of appellant. It has the name of Titan stamped upon it as is shown by the exhibit. The valve is used in a number of water heaters manufactured by other companies.

The question on which this case turns is whether or not, on the record as made, appellant may be held liable for having furnished the defective safety pilot valve involved in this case as a replacement for another defective one which was a part of the water heater manufactured by it.

Appellant takes the position that it is not liable for any defect in the safety valve in question, that it merely purchased the item from the responsible manufacturer thereof and sold it in the original package as a separate item of merchandise without any reason or duty to inspect or test it.

Appellee's case was tried upon the theory that a manufacturer which incorporates into its own product certain parts manufactured by another and distributes the finished product under its own name and which undertakes, in the ordinary course of its business, to supply replacements for use upon and in its manufactured product, is liable, if by reason of its negligence in furnishing a defective replacement part damage is done. In other words, it is appellee's theory that appellant would have been liable for any damage sustained by reason of its having incorporated a defective safety pilot valve in any water heater manufactured by it and distributed in its own name, and that, by the same token, if it undertakes to replace a part of the heater which fails, it must exercise the same care it was bound to exercise when it installed the part which was replaced. Stating it differently, may the manufacturer of a water heater replace a defective part thereof with another part which is so defective as to cause great damage, and escape liability because the part which it supplied to replace the original part was manufactured by another?

Appellant furnished its distributors and dealers with a catalogue for replacement parts which were designated by

numbers. The type of pilot valve involved here was listed in that catalogue.

A jury verdict for plaintiff for $90,000 was followed by motions for judgment notwithstanding verdict and for a new trial, alleging as grounds therefor that plaintiff failed to prove defendant negligent in that the testimony showed the safety pilot valve Exhibit 9-A was not on the heater as assembled by it, that it was manufactured by Titan Valve & Manufacturing Company, that if it was defective it was so when it left the Titan plant in Cleveland, that there was no evidence it ever passed through appellant's hands, that there was no evidence it was furnished by appellant as a replacement and that appellant was merely a dealer in a chain of sales. Adverse rulings thereon and certain instructions given the jury and refusal to give others are assigned as error.

I. Appellant manufactured the water heater partly by assembling parts manufactured by others. It would be in no position to disclaim liability for the failure of the original safety valve placed therein. Standing in the position of manufacturer it was responsible for all parts of the heater as originally put out.

"It was the duty of the defendant to use due care in constructing the heater in suit and to see that it was equipped with a safety pilot which would completely shut off gas from the burners when the pilot flame was out, so that the heater could safely be used for its intended purpose and would not be a menace to those who used it or were near it. It was also the duty of the defendant to make all the ordinary and necessary tests to ascertain whether the safety pilot was in proper working condition and properly adjusted before the heater left the factory. * * * The evidence shows that if a safety pilot is improperly adjusted, so that gas can flow to the burners when the pilot flame is out, that fact is easily discoverable by simple tests. If a manufacturer fails to discover it, the fault is his and not that of the ultimate purchaser or user of the dangerous heater." American Radiator & Standard Sanitary Corp. v. Fix, 8 Cir., 200 F.2d 529, 536.

See also Willey v. Fyrogas Co., 363 Mo. 406, 251 S.W.2d

635; O'Rourke v. Day and Night Water Heater Co., 31 Cal. App.2d 364, 88 P.2d 191; McPherson v. Buick Motor Co., 217 N. Y. 382, 111 N.E. 1050, L. R. A. 1916F 696, Ann. Cas. 1916C 440; Johnson v. Cadillac Motor Car Co., 2 Cir., 261 F. 878, 8 A. L. R. 1023; Alexander v. Nash-Kelvinator Corp., 2 Cir., 261 F.2d 187; Central Steel Tube Co. v. Herzog, 8 Cir., 203 F.2d 544; Hartmon v. National Heater Co., 240 Minn. 264, 60 N.W.2d 804; Lovejoy v. Minneapolis-Moline Power Implement Co., 248 Minn. 319, 79 N.W.2d 688; Ryan v. Zweck-Wollenberg Co., 266 Wis. 630, 64 N.W.2d 226.

In the case of American Radiator & Standard Sanitary Corp. v. Titan Valve & Manufacturing Co., 6 Cir., 246 F.2d 947, 950, plaintiff sought indemnity from defendant as supplier of a defective valve. The court said:

"It is to be borne in mind that both parties were skilled manufacturers, with an equal opportunity to inspect the pilot valve. Because American was repeatedly installing the safety pilot in one of its heaters for the market, it owed its customers the duty of reasonable care in determining whether the pilot installed was workable and suitable. Its failure to make the simple test which would have discovered the defect in the safety pilot involved constituted negligence even though it had no original obligation with reference thereto. [Citing cases] * * * It [the district court] also found that American's failure to discover the improper calibration constituted active negligence on the part of American." Indemnity was denied.

"The fact that a manufacturer purchased defective parts from another does not free him from negligence in marketing a defective article, and he is under a duty to subject all parts so purchased to ordinary and simple tests, the nature of which must vary with the nature of the thing to be inspected; and, if he fails in this duty with respect to defects which could have been discovered by such tests, he is negligent and liable for resulting injuries." 65 C. J. S., Negligence, section 100, page 632.

"The courts are now practically agreed that the manufacturer of an article inherently dangerous to life or limb is liable to a third person for personal injuries resulting from the failure

of the manufacturer to exercise due care to protect anyone having proper occasion to use the article in the manner intended by using such precautionary means as the character of the article requires." 46 Am. Jur., Sales, section 814, page 938.

Appellant's contention that, as regards the replacement valve, it was only an intermediary seller, and as such had no duty to inspect the valve, calls for further consideration.

In Restatement of the Law, Torts, section 388, page 1039, it is said: "One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be in the vicinity of its probable use, for bodily harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier (a) knows, or from facts known to him should realize, that the chattel is or is likely to be dangerous for the use for which it is supplied; (b) and has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition; and (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be so."

See also Driekosen v. Black, Sivalls & Bryson, Inc., 158 Neb. 531, 64 N.W.2d 88.

Restatement of the Law, Torts, section 400, page 1086, states: "One who puts out as his own product a chattel manufactured by another is subject to the same liability as though he were its manufacturer."

Restatement of the Law, Torts, section 401, page 1087, states: "A vendor of a chattel made by a third person which is bought as safe for use in reliance upon the vendor's profession of competence and care is subject to liability for bodily harm caused by the vendor's failure to exercise reasonable competence and care to supply the chattel in a condition safe for use."

Under section 402, 1948 Supplement to the Restatement of the Law, appears this comment: "(b) There is a clear distinction between the liability of a manufacturer and that of a vendor for harm caused by a chattel made by the former and sold by the latter. The manufacturer of a dangerously defec-

tive chattel is the creator of something which is foreseeably dangerous when it is used for the purpose for which it is manufactured. The constructing of the chattel defectively, with knowledge it is to be sent out to be used, is an unreasonably dangerous activity. On the other hand, the vendor who reasonably believes that the chattel he is selling is safe for use is not, in selling and delivering the chattel, doing anything which is foreseeably likely to cause harm. The slight risk inherent in the possibility the chattel may be defective is not sufficient to constitute an unreasonable risk. The burden on the vendor of requiring him to inspect chattels he reasonably believes to be free from hidden danger outweighs the magnitude of the risk that a particular chattel may be dangerously defective. * * * Negligence is determined in the light of the facts known to the actor."

In the instant case appellant well knew that the valve was an imminently dangerous instrumentality if not properly calibrated and that, if not properly constructed and calibrated, it might cause such damages as those suffered by appellee in this case, and thus we believe the jury could well find from the evidence that appellant was negligent in not inspecting Exhibit 9-A and discovering its defects before sending it to Wigman Company. Appellant's position was entirely different from that of the ordinary wholesaler or retailer who purchases something not imminently or inherently dangerous from a reliable manufacturer in full reliance upon the faithful performance by the manufacturer of its duty to be free from negligence. It tested carefully each completely assembled heater it marketed and had full knowledge of dangers inherent in defective safety pilot valves. Appellant had facilities for making adequate tests. They were not difficult to make. Danger of serious injury lurks in any defective valve. Appellant subjected other valves to an adequate test and it must be said it did so because it had no reason to believe and did not believe all such valves put out by Titan were safe to use. There is no evidence that it waived inspection and examination of Exhibit 9-A because it relied upon the competency of Titan. It appears rather that it subjected the valves to careful tests when placed in its water

heaters, which it probably would not have done had it relied upon the quality of the valves when received from Titan. The damage sustained by appellee could reasonably have been foreseen and anticipated by appellant.

With reference to the duty of a seller to inspect, this court in Moyers v. Sears-Roebuck & Co., 242 Iowa 1038, 1052, 1053, 48 N.W.2d 881, 889, said:

"Another case which lays down rules regarding furnaces and installations is that of Holland Furnace Co. v. Nauracaj, 105 Ind. App. 574, 584, 14 N.E.2d 339, 344. Speaking of the duty a seller owes the purchaser of such an article the court said: ' "One who supplies a thing for such use by others that it is obvious that any defect will be likely to result in injury to those so using it is liable to any person who, using it properly for the purpose for which it is supplied, is injured by its defective condition." '

"Under the subject of Negligence we call attention to the annotation of volume 74 A. L. R. at page 347, where it lays down the rule of the duty of the seller to make an inspection where the article sold has some defect."

See too Flies v. Fox Bros. Buick Co., 196 Wis. 196, 218 N.W. 855, 60 A. L. R. 357; McPherson v. Buick Motor Co., 217 N. Y. 382, 111 N.E. 1050, L. R. A. 1916F 696, Ann. Cas. 1916C 440; Annotations in 17 A. L. R. 701; 60 A. L. R. 371; 39 A. L. R. 997, 998; 63 A. L. R. 346; 88 A. L. R. 532; 105 A. L. R. 1509; 111 A. L. R. 1246; 140 A. L. R. 238 and 249; 164 A. L. R. 569 at 584.

We hold that under the evidence in this case and the authorities cited appellant had a duty to inspect the valve unit, and its failure to discover and correct or warn against the defective valve amounted to actionable negligence on its part.

II. Appellant insists the valve was sold merely for inclusion in the distributor's stock and not as a replacement of the original valve on the heater. It is our opinion there was sufficient competent evidence in the record to justify the jury in finding otherwise. The safety pilot unit Exhibit 9-A was sold by appellant to Wigman Company which as a wholesaler handled appellant's heaters and replacement parts exclusively.

Wigman was not a manufacturer of water heaters and therefore a natural inference arises that when appellant supplied Wigman with such pilot valves it knew such items were for replacement purposes only, and since Wigman handled only appellant's water heaters it would be a natural though not conclusive inference that such parts were for replacement of similar parts on appellant's heaters. When Senecal procured Exhibit 9-A from Wigman Company he told them he wanted a thermocoupler unit for that particular heater.

P. C. Cosner, purchasing agent for Wigman Company, testified: "They are kept in stock only as replacement safety pilots for American Budget water heaters. We do not sell these safety pilots for installation in any other water heater. * * * Exhibit 15 is an invoice including one B114-22 pilot, dated December 5, 1952, to Senecal Lumber, Salix. It is an invoice from our company for the purchase of one of these safety pilots on that date. Exhibit 16 is a credit memorandum to Senecal Lumber for a B114-22 pilot dated December 9, 1952."

Fred J. Mueller, employee of appellant, testified: "This particular valve, Exhibit 9-A, was manufactured in large quantities for us. * * * the valves that are assembled in our heater go through a functional test when the heater is tested as an integral unit, * * *. When they are packaged by us we have put them through a functional test at the factory, the thermostat, the heat controls and the safety pilot or thermocoupler unit."

Cosner further testified: "On December 5, 1952, Senecal purchased the automatic safety pilot unit, Exhibit 9-A, from Wigman. It was delivered in the original carton, sealed. Subsequent to that date Senecal returned the pilot to Wigman. We wrote to American Radiator for instructions to return it. * * * We performed no tests on these valves at all in our warehouse before sending them out to the dealers. We relied on American to do that. * * * Senecal did not pay us for safety pilot unit 9-A. A charge is made for the replacement and full credit allowed when the pilot is returned. * * * We received a safety pilot back from Senecal and gave him credit for it. Our procedure for handling returned items is to write to American, advise them what the items are and request shipping

instructions for the return and credit. They gave shipping instructions for the return and gave us credit."

If it were appellant's duty to inspect and test the pilot valves on the heaters it manufactured it would appear sound reasoning would require it likewise to test any replacements made by it. How logical would it be to say that appellant is negligent if it places defective safety valves on its heaters but is not negligent if it replaces such a valve unit with one which will not function safely and which it knows may cause serious damage? If it makes a replacement it should be substantially the equivalent of what was required of the part replaced.

That Exhibit 9-A was bought by Senecal as a replacement for one of appellant's valves cannot be questioned. That appellant knew it was to be a replacement for some defective valve is equally certain. Having sold it for replacement purposes appellant should not be permitted to escape the direct consequences of the sale and replacement it brought about with full knowledge of the possible danger involved. Appellant knew if the safety valve on one of its units sold by Wigman went wrong it would be replaced by Wigman with a unit supplied by it, and owed a duty to see that such unit was reasonably safe for the purpose for which intended.

III. Appellant insists the jury should have been instructed that it had a right to rely upon the manufacturer of the valve for inspection tests. We do not agree it had such right. There is evidence in the record that Titan was a large manufacturer producing patented safety valves but we fail to find any evidence that its products were reliable or that appellant relied upon or had any reason to rely upon the efficiency of the valves Titan put out.

Mueller testified: "With respect to whom we rely on to make the tests before it is installed on the heater, we rely on Titan *to furnish us the valve.*" (Emphasis supplied.) This statement cannot be construed as evidence appellant relied upon Titan to make the necessary tests. If appellant relied upon Titan to make the necessary tests to insure safe performance of the valves or had reason to rely thereon it should have offered some positive evidence to support such reliance. Appellee cites

and appellant refers to American Radiator & Standard Sanitary Corp. v. Titan Valve & Manufacturing Co., supra. The facts there disclosed and now a matter of judicial record may have had something to do with the further fact that appellant offered no evidence Titan was a reputable manufacturer or that appellant relied or had any right or reason to rely upon the adequacy of Titan products. The fact such important evidence was not offered suggests that it was not available.

■ IV. It is urged the jury should have been instructed that the use of the valve for approximately five years without mishap might be considered as evidence the valve was in safe working condition.

Mr. Amidon as an expert testified: "Q. Now is it possible, would it be possible for this heater to operate for as long as five years without ever needing the function of this safety valve? A. It is possible for this heater to operate indefinitely without the safety valve functioning. * * * Q. In other words, sir, it is your opinion that this heater could have functioned indefinitely without needing the function of this safety valve? A. That is right."

"Fact that automatic gas water heater had been successfully used by buyers for 23 months and fact that valve on heater had been inspected by retailer, did not, as a matter of law, relieve manufacturer of heater * * * from liability for death of buyer who was fatally injured by explosion allegedly caused by defective condition of valve, where effectiveness of the valve had not been tested by its use over the 23-month period." Willey v. Fyrogas Co., 363 Mo. 406, 251 S.W.2d 635, 636.

The jury was instructed that the plaintiff must prove by a preponderance of the evidence that Exhibit 9-A had never functioned as a safety control unit after its installation upon Exhibit 8 (the heater). In response to special interrogatories the jury found the defect in calibration occurred at the Titan factory and that it was the proximate cause of the resulting injuries to plaintiff. It was told to consider all evidence, facts and circumstances proved upon the trial. We have carefully examined the instructions given and find no reversible error therein.

16

V. It is claimed the verdict for $90,000 was excessive and the result of passion and prejudice. At the time of the explosion the plaintiff was 25 years old and her life expectancy was 42.12 years. She had a husband and four small children. She was hospitalized 396 days and underwent 61 operations which included skin grafts. Twelve blood transfusions were required. Her pain was so intense that potent narcotics were used from the day of the accident, July 2, 1957 until May 1958. There was evidence she will never be able to walk normally and will never regain full normal mobility of her knees, ankles or right hand. Fifty per cent of the surface of her body was burned. It is claimed forty per cent of her body suffered second- and third-degree burns. Her injuries have placed some limitations upon her normal activities as a wife, mother and home-maker. She will no doubt suffer some mental and physical pain and anguish in the future. It is impossible to place a monetary value upon the physical and mental damages done to the human body. Pain, suffering and mental anguish are not susceptible of dollar valuation. Money cannot completely compensate for pain and suffering or permanent physical injuries. As the only alternative, however, such compensation may be sought, from one who has negligently injured another, where more adequate compensation may not be had.

The verdict in this case is the largest that has come before this court in a personal injury case. The nearest approach to it was $10,000 less. The decreasing purchasing power of the dollar, the increase in the cost of living and in earning power have had an inevitable tendency to bring about larger verdicts. Ferris v. Riley, 251 Iowa 400, 101 N.W.2d 176; Weilbrenner v. Owens, 246 Iowa 580, 589, 68 N.W.2d 293, 298, and cases cited therein.

In considering damage awards each case must depend upon its own facts, and precedents are of little value. Ferris v. Riley, supra; Soreide v. Vilas & Co., 247 Iowa 1139, 1153, 78 N.W.2d 41, 50.

We cannot say the jury was actuated by passion or prejudice in arriving at its verdict.

Although it is true the amount of the verdict is large, it

was the considered opinion of the jury after hearing the evidence as to appellee's injuries that the amount represents the fair and reasonable measure of damage sustained by the plaintiff. We are not disposed to interfere with the verdict of the jury in this case.—Affirmed.

LARSON, C. J., and HAYS, PETERSON, and THORNTON, JJ., concur.

THOMPSON and GARFIELD, JJ., dissent.

OLIVER and BLISS, JJ., not sitting.

THOMPSON, J. (dissenting)—I am unable to agree with the conclusions reached by the majority and must dissent. The vital question in the case is whether the defendant furnished the replacement part as a manufacturer or merely as a vendor. The trial court in its instructions and by other rulings permitted the jury to find that it was in the position of a manufacturer. With this I disagree.

It is well settled that a manufacturer who uses parts made by another in assembling its finished product is responsible for defects in such parts if they cause injury. It is equally well settled that a mere vendor is ordinarily not so liable. The problem here is to determine in which category the defendant should be placed. No authority is cited for the proposition that an original manufacturer who furnishes replacement parts, made by another, is still a manufacturer as to those parts. The rule has never, until now, been so extended. The trial court in its Instruction No. 18 told the jury, "The undisputed record in this case discloses * * * that said Wigman Company had ordered and secured said safety pilot valve unit from defendant American Radiator and paid American Radiator for same; * * *." P. C. Cosner, purchasing agent for Wigman Company, testified he could not say whether the unit in question came directly from Titan at Cleveland or from the defendant's plant at Buffalo. The valves were shipped to them by enclosing each separately in a small box or carton, sealed. Valves similar to the one involved here were manufactured by Titan for several large companies in addition to the defendant. Each package bore

the Titan number B114-22, and the name "Titan" was embossed upon the valve itself.

The reason why a manufacturer is liable for defects in parts made by others but assembled by it and installed in its finished product is not difficult to understand. It is putting out the product as its own; it has an opportunity to inspect it, and has a duty to do so. But when the article is sold, free from defects, its liability should end. If it offers service to purchasers of its original product in the way of replacement parts made by another manufacturer, under the circumstances here I think it does so merely as a jobber or wholesaler. It is in no different position than Wigman or any other middleman. The task of inspecting the valves as they come from Titan, each sealed in its own container, would be an extremely, perhaps prohibitively, heavy one. The point is well made at page 717, Restatement, Torts, 1948 Supplement, as follows: "The burden on the vendor of requiring him to inspect chattels he reasonably believes to be free from hidden danger outweighs the magnitude of the risk that a particular chattel may be dangerously defective."

The authorities cited by the plaintiff all deal with the original manufactured product. No case has gone so far as the majority takes us here; that is, so far as the plaintiff's brief goes, no court has heretofore held that an original manufacturer who furnishes a service of selling replacement parts made by another owes a duty to inspect, absent any reasonable basis for suspecting defects. Titan is, under the record, a large manufacturer of these valves; it furnished them to several other large companies. The defendant had a right to rely upon Titan to make tests, or otherwise furnish safe products. Division III of the majority opinion seems to shift the burden of showing negligence from the plaintiff to the defendant to show it was not negligent. It was not necessary for defendant to show it relied upon the manufacturer of the valve to make necessary tests; the law, as I understand it, gives it that right, and the burden should be upon the plaintiff to show a reason, if any there was, why it could not so rely.

I would hold the defendant in furnishing the replacement part was not a manufacturer, but merely a jobber or other

intermediary between Titan, the actual maker of the valve, and the other middlemen and the ultimate purchaser. The majority is creating a precedent not supported by any decided authority or by logic. I would reverse with directions.

GARFIELD, J., joins in the dissent.