ORRIN J. MCKIRCHY, individually and as natural parent and next friend of MARY PAT MCKIRCHY, appellee, v. GILBERT NESS and CLYDE SANBORN, appellants.

No. 51357.

(Reported in 128 N.W.2d 910)

JUNE 9, 1964.

Anderson & Pelzer, of Estherville, for appellant Gilbert Ness.

Linnan, Lynch & Straub, of Algona, Irish & Skinner, of Altoona, and Jones & Hoffmann, of Des Moines, for appellant Clyde Sanborn.

James, Greer & Nelson, of Spencer, for appellee.

MOORE, J.—This is an action for damages brought by Orrin J. McKirchy, as father and next friend of Mary Pat McKirchy, both for himself for hospital and medical expenses, and on behalf of his daughter for personal injuries arising

out of a collision October 14, 1961, a mile west of Estherville on highway 9 between the automobile in which Mary Pat was riding and a truck owned by defendant Clyde Sanborn and operated by defendant Gilbert Ness.

A jury not having been requested, the cause was tried to the court resulting in judgment against both defendants in favor of Orrin J. McKirchy for $7347.95 and Mary Pat for $45,000. Both defendants have appealed.

Sanborn in his brief asserts the trial court erred in finding (1) his truck was being driven with his consent by Ness, (2) Ness was guilty of negligence which was a proximate cause of the collision, and (3) Mary Pat free from contributory negligence. His fourth assignment of error is the amount allowed Mary Pat is excessive.

Ness has joined in the Sanborn brief but only in the last three assigned errors.

Defendants concede if Mary Pat is entitled to recover her father is entitled to recover for hospital and medical expenses resulting from her injuries. For clarity we therefore refer to Mary Pat as plaintiff and to defendants by their last names.

No authorities need be cited to support the proposition that findings of fact by the trial court in this law action are binding upon us if supported by substantial evidence. See rule 344(f)1, R. C. P. As to the first three assigned errors the question presented is whether as a matter of law the evidence fails to create a fact question for the trier of the fact.

I. Plaintiff's petition pleads the necessary elements of a negligence case and alleges Ness was driving Sanborn's truck with his consent. Plaintiff claims Sanborn is therefore liable as Code section 321.493 provides:

"Liability for damages. In all cases where damage is done by any motor vehicle by reason of negligence of the driver, and driven with the consent of the owner, the owner of the motor vehicle shall be liable for such damage. * * *"

Sanborn's answer denies plaintiff's allegation of consent. Ness' original answer, which was allowed to stand until the close of all the evidence, admits plaintiff's allegation of con-

sent. The trial court after the evidence was closed permitted Ness to change his answer to a denial of consent.

■ ■ We have frequently said the defense of nonconsent is one which can be easily made, with little probability it can be met with direct refutation. It is not necessary plaintiff adduce such direct testimony. When ownership of the motor vehicle is admitted, as it is here, a prima facie case is made on this issue by plaintiff, or as it is sometimes expressed an inference, or a presumption is created that the vehicle was being operated with consent of the owner, and there must be sufficient showing to the contrary if the owner would avoid that finding. Plaintiff may aid this inference of law by direct evidence and by proof of facts and circumstances from which inferences may be drawn. As we have said, this inference is not a strong one, and it in no way changes the burden of proof. The owner may oppose the inference by such admissible testimony as may be available to him. But such testimony, though positive and direct, is not necessarily conclusive. It may be weakened or rebutted by facts and circumstances, or by its own inherent weakness or unreasonable character. The weight of the testimony and credibility of the witnesses depend upon facts and conditions as shown by the record in each case. This particular issue, as it comes before the courts, is one which the average jury is peculiarly well fitted to pass upon and arrive at a correct conclusion. Our earlier cases which consider these matters are ably discussed and well summarized in Bridges v. Welzien, 231 Iowa 6, 300 N.W. 659. See also Anderson v. Lehner, 243 Iowa 851, 52 N.W.2d 513; Harms v. Ridgeway, 245 Iowa 810, 64 N.W.2d 286.

In the Bridges case we recognized there are cases where it is the duty of the trial court to direct the verdict and we cited many cases where we have held consent had not been established. We also cited at least an equal number of cases where we have held the issue of consent was for the trier of the fact.

■ When, as here, the issue of consent is tendered by pleading and proof the issue is for the trier of the fact unless the defendant's evidence conclusively rebuts the inference of

consent. As stated in Curry v. Bickley, 196 Iowa 827, 832, 195 N.W. 617, 619: "* * * the inference that a car is being operated at a given time by the owner, or with his consent, does not require that every case shall go to the jury where the undisputed and uncontroverted evidence establishes the facts so conclusively that the inference is overcome."

Sanborn contends the proof here conclusively overcomes the inference of consent and therefore the trial court's finding of consent is not supported by substantial evidence. This leads us to the evidence submitted on this issue.

From 1946 Sanborn owned and operated a furniture store in Estherville. During the period from 1959 through 1961 he was assisted by his wife and had two regular full-time employees (Pullen and May). One truck was used full time for deliveries and on carpet and linoleum laying jobs.

He also operated his farm a mile and a half east of town where he personally did most of the fieldwork. Some hired help was used on occasions. His wife's brother and mother had occupied the farmhouse before it was rented to Ness in January 1959.

Ness paid $35 a month rent for the farmhouse and garage. Cost of electricity at the farm was paid partly by Sanborn and partly by Ness. Sanborn also employed Ness to care for livestock, do chores, general farm work and render such services as required on the farm. Ness kept his own time for which he was paid $1.25 per hour. He also did some work for others away from the farm.

In 1956 Sanborn bought a used Ford truck as an auxiliary vehicle, to be used in connection with the store business, which he kept at the farm and where it was also used by Ness and one Barlow in connection with the farm work. The key to this truck was kept at the store until about 60 days before the accident during which period it was left at the farm. Ness testified: "I had the keys to that truck approximately two months or thereabouts."

Sanborn testified: "I had taken the key to the truck out to the farm, put it in there, and told Mr. Ness, as the work broke, and one thing, to haul the straw down from the Mc-

Cain farm and stack it up and store it up and put it in a nice pile."

Prior to that time Ness had used the truck to haul beans to the elevator and baled hay to the Barlow farm, a distance of twelve and one-half miles.

Regarding use of the truck by Ness to haul trash, Sanborn testified: "When Ness hauled trash to the dump he was hauling refuse from the house, I suppose, and also natural stuff that accumulates on the farm, wire, barrels and pieces of different kinds of trash, limbs off trees, rubbish that accumulates. I have never discussed this situation with Mr. Ness."

Carl Barlow did part-time work for Sanborn at the farm and was permitted by Sanborn to use the Ford truck for his personal use for transportation to and from the Barlow farm. He usually had specific permission from Sanborn to so use the truck but on some occasions used it without getting permission.

Sanborn testified he had told all his employees they were not to take the trucks for personal use and that at one particular time he so advised Ness and Barlow they were not to so use the Ford. Ness was unable to recall any such admonition.

Pullen had used the store truck on many occasions over a considerable space of time to go for coffee, get his children at school and buy groceries for his family. Pullen testified Sanborn never gave him any instructions he was not to use the truck for his own purposes.

Sanborn denied knowledge of any of his employees using his trucks for their personal business except a few occasions when he specifically granted Barlow the use of the Ford when Barlow did not have his own car.

Mrs. Wampler's home was two thirds of a mile west of the farm on the gravel road into Estherville. She testified: "Q. How many times would you say that you positively saw that truck go by when it was being driven by Mr. Ness? A. Oh, I don't think I could remember a definite number of times. It was often, but I couldn't say any definite number."

She later testified she knew Sanborn and the truck went by several times when he was not driving it but it could have

been somebody other than Ness. The weight and credit to be given her testimony was for the trial court. The trial court in the findings observed that she had pointed out Mr. Ness in the courtroom.

Ness testified that on the night of the accident (October 14, 1961) he was home in bed when his boys called to report their car was stalled near the Estherville Drive-In Theater, his car was without a battery, he drove Sanborn's Ford truck, with all lights working, into town, stopped to get a beer, drove to the A. & W Root Beer stand, entered the east, came out the west driveway and shortly thereafter the truck was struck from the rear by the car driven by Dwight Paul Hansen in which plaintiff was riding.

On cross-examination Ness testified he had said to his wife, "I hate to take Clyde Sanborn's truck". However, he did not feel he was stealing it but up to that time he had never used it for his own purpose or had Sanborn's permission to do so.

The day after the accident Ness' son informed Sanborn of the accident and later Ness talked with Sanborn. Sanborn on neither of these occasions said anything about Ness not having permission to use the truck. Mrs. Sanborn, in the presence of her husband, told Ness "don't say anything to anyone".

Several weeks after the accident Sanborn asked Ness to come to the store at which time he was asked and did sign a statement that he did not have permission to drive the truck the night of the accident. It had been prepared by Sanborn. Ness testified Sanborn told him a few days after the accident he had no business taking it.

On rebuttal plaintiff offered the petition and Ness' original answer admitting plaintiff's allegation of consent. Sanborn objected to the offer of both. Ness objected only to the offer of plaintiff's petition and stated he had no objections to the answer. The trial court observed they were part of the pleadings and made no rulings on these objections. No assignment of error or argument is made because the court failed to rule. We therefore do not decide any issue raised by the objections.

The record discloses Sanborn was represented by counsel within three days of the accident. He paid $60 for a bond to

post security under the provisions of Code section 321A.6. He could have avoided this expense if he had signed and filed an affidavit to the effect that "the vehicle was being operated without his permission, express or implied, * * *." See Code section 321A.6(3).

After citing Bridges v. Welzien, supra, and other case authority on the law applicable to the question of consent, the trial court made the following finding: "After thoroughly and fairly considering all evidence and circumstances as shown by the record the Court is of the opinion that there is substantial evidence of facts and circumstances from which inferences may reasonably be drawn refuting the owner's denial of consent and holding that there was implied consent given by Sanborn for operation of the truck by Ness on the night of the accident."

We hold the trial court's finding of consent is supported by substantial evidence.

■■ II. Defendants argue the evidence fails to establish any negligence by Ness which was a proximate cause of the accident. We find no merit in this contention. As Ness drove west on highway 9, west of Estherville, he passed the Skyline, the Drive-In Theater and then turned into a driveway of the A & W Root Beer stand. These businesses are all located on the south side of highway 9 and are not far apart. Shortly after the pickup reentered the highway it was struck from the rear by the Chevrolet automobile driven by Hansen. The truck was being driven at a low rate of speed.

Witness Reed testified he had stopped his vehicle off the pavement on the north side of highway 9 directly across from the Skyline and approximately 100 yards east of the A & W stand when he observed the Ford pickup drive by headed west, its headlights were very dim and it had no taillight. He did not continue to watch the truck but 60 to 90 seconds later heard the crash and immediately went to the scene which was east of the east A & W driveway. He estimated the east and west driveways to the A & W were 60 feet apart.

Witness Robinson, an occupant in Reed's car, testified the headlights of the truck were very dim and it had no taillight as it passed, she did not observe the truck again until it

pulled out of the east driveway of the A & W, without stopping, and as it reentered highway 9 the crash occurred.

Witness Jorgenson and Tow testified when leaving the Drive-In Theater they stopped their vehicle before entering the highway, looked west, saw what at first looked like an old car but was the Ford truck without headlights on and beyond which they saw a pair of headlights. Within seconds the collision occurred a distance of 50 to 75 yards west of them.

Hansen testified he approached the closed root beer stand from the west on highway 9 at approximately 45 to 50 miles per hour, he was looking straight ahead, saw no truck or taillight but saw what appeared to be a gray mass when it came within his headlight beams and remembers little more about the accident as he received a head injury.

Ness testified he stopped before reentering highway 9, looked west, saw no headlights west of him at that time or anytime before the collision. He was unaware at anytime before the collision a car was approaching from the west.

Generally questions of negligence, contributory negligence, and proximate cause are for the trier of the fact; it is only in exceptional cases that they may be decided as matters of law. See rule 344(f)10, R. C. P.

Plaintiff's pleaded specifications of Ness' failure to stop before entering a highway from a private driveway, display proper lights, and keep a proper lookout find support in this record. The trial court's findings of negligence and proximate cause are supported by substantial evidence.

▮ III. During the early evening the night of the accident Dwight Hansen, plaintiff's boy friend, came to her home in .Estherville after which they went to his home in Spirit Lake and spent the evening with his parents. They then started back to Estherville. Plaintiff testified:

"I don't remember what time we started back. When we got in the car coming back I was sitting on the passenger side. I started out sitting erect. I do not know what time it was. As we went in an easterly direction we were traveling on Highway 9 on the right side of the road.

"As we went along toward Estherville that night I laid down in the front seat and went to sleep. I was laying on my left side facing the front of the car. My head was in his lap. I don't recall where we were when I put my head in his lap and went to sleep. It was some time after we left Spirit Lake. The first thing I remember fully about this collision is waking up and being in the ditch. From the time I put my head in his lap until I woke up in the ditch I had never sat erect or looked to the east. At the time of the impact I was asleep. The first thing I recall was that I was in the ditch and Ardyce Robinson was talking to me and putting a blanket on me."

Hansen gave substantially the same testimony. He was very familiar with the road. The weather was clear. There was nothing unusual about the condition of the road that night. He was driving his usual speed of 45 to 50 miles per hour. He had not been drinking.

Defendants assert the trial court erred in finding plaintiff free from contributory negligence. They cite and rely heavily on Paulsen v. Haker, 250 Iowa 532, 95 N.W.2d 47, and Peterson v. Davis, 254 Iowa 1359, 121 N.W.2d 111. They are easily distinguishable on facts with our case here. In the Paulsen and Peterson cases there was a total lack of evidence showing the plaintiff-passenger's action immediately before and at the time of the accident which might or might not have contributed to plaintiff's safety. In those cases plaintiffs simply failed to submit any evidence to show what they were or were not doing. No evidence was submitted on which the trier of the fact could make a determination of the question of contributory negligence. Here plaintiff's conduct as a passenger was fully shown in the evidence. We point out and discuss the effect of such difference in proof in Puhrmann v. Lund, 254 Iowa 304, 117 N.W.2d 495. Whether she exercised reasonable care as a passenger under the circumstances and whether any failure to so act contributed to the accident were questions of fact for the trial court.

61 C. J. S., Motor Vehicles, section 488b, states: "The fact that a guest in a motor vehicle closes his eyes, at a time when there is no indication of danger, or the fact that the guest dozes or is asleep at the time of the accident does not necessarily con-

stitute contributory negligence unless there is a causal connection between the fact that the guest is asleep and the accident. The fact of the guest being asleep at the time of the accident is merely one of the circumstances to be considered in connection with other surrounding circumstances, * * *."

See also 8 Am. Jur.2d, Automobiles and Highway Traffic, section 535.

In Fry v. Smith, 217 Iowa 1295, 253 N.W. 147, plaintiff riding in front seat of car driven by her husband voluntarily went to sleep and remained so at the time of the accident. We held she was not guilty of contributory negligence as a matter of law. It is on all fours with the facts here and defeats defendants' contention made in their third assigned error. See also Hamilton v. Boyd, 218 Iowa 885, 256 N.W. 290; Mathews v. Beyer, 254 Iowa 52, 116 N.W.2d 477.

█ IV. The out-of-pocket expense of Orrin J. McKirchy for medical, hospital, drug and transportation expense for plaintiff's care of $7347.95 is without dispute and not contested by defendants. However they contend the trial court's award of $45,000 to Mary Pat is excessive.

At the time of her injury plaintiff was in good health, 19 years old with a normal life expectancy of 52.19 years. She was taking nurses training and engaged in a normal active life. At age 6 because of a congenital condition her right kidney was removed. According to the evidence nature compensates to some extent for such a loss at early age by strengthening the remaining kidney. She had some illness also at age 14.

Following the accident in which plaintiff received severe injuries, particularly to her left kidney, she was treated at the Holy Family Hospital at Estherville until October 19 when she was taken to St. Mary's Hospital at Rochester, Minnesota, where she remained until December 13. She was unconscious most of the time for a week after the accident. Surgery was performed the night of the accident and again one week later at Rochester. On her release from St. Mary's Hospital she was returned to the Estherville hospital where she remained until December 20. She then was moved to her home in an extremely weak and anemic condition. She returned to Rochester in January and March for

checkups and again in May where she was confined to the hospital for 13 days with kidney stones. She returned again to the hospital in July and August 1962 for further checkups.

Defendants offered no medical testimony. Dr. James De-Weerd, plaintiff's treating doctor at Rochester, testified: "In my opinion the trauma and resultant destruction of what I estimated grossly to be approximately $\frac{2}{5}$ to $\frac{1}{2}$ of her kidney substance has reduced what we speak of as renal reserve to practically zero. The hazards of living are significantly increased inasmuch as her kidney functioning capacity is not within average normal ranges, and therefore anything which would further disturb such kidney function could indeed be serious for her. I believe that additional injury would indeed be a serious matter for her. As a result of this trauma her body as a whole is not more susceptible to infection but the kidney, I believe, is definitely more susceptible to infection than it was prior to the injury. I have advised her to avoid certain activities. Anything which we as normal individuals might accept as being an acceptable risk might be an intolerable risk to her. Trauma is one of these. Infection is another. I think it is impossible to evaluate accurately the effect of strenuous living, fatigue per se. However, I have advised her that she must avoid a continuous, strenuous program which in the vernacular might be called burning the candle at both ends. I think it is advisable that she have more rest and a more controlled living. * * * I have told her that it is my very firm opinion that she should never become pregnant. This is based on the knowledge of her decreased renal reserve and a very distinct feeling that her kidney would not support the added physiological load that a pregnancy entails. * * * This trauma has had a significant psychological effect upon this patient. * * * I feel that Mary Pat McKirchy's permanent disability is in the neighborhood of 35%. I do not anticipate that her situation will be improved."

The testimony of Dr. E. K. Vaubel, plaintiff's Estherville treating doctor, is substantially the same as Doctor DeWeerd.

They also testified she would continue to have pain in the future and require regular periodic examinations resulting in

further medical and hospital expense and gave an estimate of the cost thereof.

We have frequently and consistently held we will not disturb the amount of a verdict unless it is so flagrantly excessive or small, or so out of reason as to shock the conscience or sense of justice, or raise a presumption that it is the result of passion or prejudice or other ulterior influence. Elings v. Ted McGrevey, Inc., 243 Iowa 815, 53 N.W.2d 882; Allbee v. Berry, 254 Iowa 712, 119 N.W.2d 230; Warrender v. McMurrin, 256 Iowa 617, 128 N.W.2d 285, and Woode v. Kabela, 256 Iowa 622, 128 N.W.2d 241.

Defendants' only argument here is that the trial court failed to give due consideration to the fact plaintiff had lost one kidney by removal in childhood and that the court went deep into the realm of speculation to arrive at his assessment of damages. We find no merit in this contention.

We are unable to say there is sufficient showing here the award by the trial court was unconscionable or so clearly excessive we should interfere.

In considering damage awards each case must depend upon its own facts, and precedents are of little value. Waterloo Savings Bank v. Waterloo, C. F. & N. R., 244 Iowa 1364, 1376, 60 N.W.2d 572, 579; Rauch v. American Rad. & Std. San. Corp., 252 Iowa 1, 16, 104 N.W.2d 607, 615, and citations. However we believe our conclusion here finds support in Bradshaw v. Iowa Methodist Hosp., 251 Iowa 375, 101 N.W.2d 167; Rauch v. American Rad. & Std. San. Corp., supra; Shover v. Iowa Lutheran Hosp., 252 Iowa 706, 107 N.W.2d 85 (retried and reported May 1964 as Cardamon, administrator v. Iowa Lutheran Hosp., 256 Iowa 506, 128 N.W.2d 226).

We find no error.—Affirmed.

All JUSTICES concur except HAYS, J., not sitting.