The **INDIANA NATIONAL BANK OF INDIANAPOLIS, Administrator of the Estate of Rudy R. Flanigan, Deceased, Plaintiff-Appellant,**

v.

**DE LAVAL SEPARATOR CO.,**
Defendant-Appellee.

No. 16136.

United States Court of Appeals
Seventh Circuit.

Jan. 29, 1968.

Raymond J. Grahn, Howard S. Young, Jr., Indianapolis, Ind., for appellant.

R. Stanley Lawton, Ice, Miller, Donadio & Ryan, Indianapolis, Ind., Elbert G. Bellows, New York City, for appellee.

Before DUFFY, Senior Circuit Judge, and FAIRCHILD and CUMMINGS, Circuit Judges.

CUMMINGS, Circuit Judge.

This diversity action was brought to recover damages for the death of plaintiff's decedent. The first count was based on negligence, and the second on implied warranty. The question here is whether the District Court properly directed a verdict for the defendant at the close of the case.

Because a verdict was directed for defendant, the evidence of course must be viewed most favorably for plaintiff. So viewed, the following facts are revealed by this record: Plaintiff's decedent was employed as a foreman in the Indianapolis plant of Standard Brands, Inc. On September 8, 1964, he was killed by the explosion of a separator manufactured by defendant in 1955 and sold to Standard Brands in 1959 for $10,750. The electrically powered separator was a commercial centrifuge and was much larger than the ordinary milk and cream separator. The rotating mass of the separator was called its bowl, weighed 338 lbs. and turned at 6,175 rpm during normal operation. The internal pressure on the revolving bowl was about 700 lbs. per square inch. The top and bottom parts of the bowl were held together by a coupling ring which was threaded to the bottom part of the bowl and held to the top part by a flange. Except for the coupling ring, the rotating mass was made of stainless steel.

Standard Brands used this machine to separate margarine oil from water in reprocessing margarine that had been damaged in packaging in its Indianapolis margarine plant. After the accident, it was ascertained that the coupling ring on the separator had corroded so badly that its original weight of 21½ lbs. had diminished to 6¼ lbs. The coupling ring was made of carbon steel and originally had a tin coating. Defendant never instructed Standard Brands to replace the tin coating when as here, it was eaten off by corrosion. Between 1959 and the 1964 accident, the coupling ring was cleaned nightly by soaking it in a hot acid solution for one-half hour. In addition to the acid cleansing, the coupling ring was scrubbed every Friday with a hot lye solution. It may also have been subjected to exposure to 2 or 3 per cent salt water in the separating operation. Because of the corrosion, the lip or flange of the coupling ring broke off during the separator's operation at 6,000 or so rpm, causing the explosion which instantly killed plaintiff's decedent. After the failure of the coupling ring, the bowl top apparently flew upwards and horizontally before killing the plaintiff's decedent.

The testimony also showed that defendant previously made coupling rings of stainless steel but had found them unsatisfactory and therefore switched to stronger but more corrosive carbon steel. In fact, defendant recalled all stainless steel coupling rings because they were considered dangerous to operations due to stress corrosion. Nevertheless, several witnesses stated that certain types of stainless steel would have been of suitable strength and yet corrosion resistant.

When defendant installed this separator in Standard Brands' Indianapolis plant in 1959, one of defendant's employees, Alfred Wood, spent a day or more at the plant. He testified that he orally instructed Standard Brands' employees on cleaning the bowl of this apparatus, and that he warned them of the necessity of replacing the coupling ring upon erosion. He did not tell them how to clean the ring. Defendant supplied an instruction booklet to Standard Brands at this time. This manual referred to the selection of discharge-ring inside diameters for butter oil, and an earlier manual lent Standard Brands by defendant recommended temperatures

for butter oil. The second manual advised the purchaser to lubricate the inside of the coupling ring before each assembly. Except for the possibly lubricating effect of the margarine itself, Standard Brands did not lubricate the ring, on the ground that lubricating oil would have adversely affected the margarine. The booklet did not tell the purchaser how to clean the machine. Defendant did not advise Standard Brands that the coupling ring might be eaten away by cleaning acids or acids in the margarine materials, and the booklet did not warn of the danger of possible deterioration of the ring or advise its replacement, although the replacement of rubber rings was advocated. Several of Standard Brands' employees realized the coupling ring was wearing out from the corrosion but did not know that its condition was dangerous. This is the first accident caused by the corrosion of a coupling ring on one of defendant's separators.

From 1960 to 1966, various customers of defendant, including several plants of Standard Brands, sent in coupling rings for replacement. About 80 coupling rings were replaced during that period. Although the average life of the separator was 15 to 20 years, the average life of the coupling ring would be 10 years under normal circumstances.[1] The coupling ring that caused the fatal accident was in use for 5 years before the tragedy occurred. Of 10,000 such rings manufactured by defendant, this was the first to fail.

At the close of the case, the District Court directed a verdict for defendant under both the negligence and implied warranty counts. We think this was correct as to the implied warranty count, but that the question of defendant's negligence should have gone to the jury.

■ The gravamen of Count I, the negligence count, is that defendant failed to warn Standard Brands of the dangerous condition that would result from the corrosion of the coupling ring.[2] Defendant admitted its knowledge that the coupling ring would gradually wear down and have to be replaced "in order to maintain the safety and integrity of the machine and the people who work around it." Nevertheless, no written warning was given about the eventual corrosion and need for replacement of this ring, or how much corrosion could safely be tolerated, or that an explosion would result from vertical forces upon failure of the coupling ring. The evidence was controverted as to whether oral warnings of any sort were given.

■ Indiana follows the general rule that a manufacturer will be held negligent if he fails to warn users of his product of its danger if the manufacturer has actual or constructive knowledge of that danger.[3] The defendant admittedly knew that the wearing down of the coupling ring would eventually jeopardize the safety of the machine and the people using it unless the ring were replaced after a certain degree of wear. If, in truth, defendant failed to warn Standard Brands of this dangerous con-

---

1. After the accident, defendant's national service manager admitted that this coupling ring "had been on borrowed time for two years." Most customers would return their coupling rings for repairs every two to three years.

2. Count I also charges defendant with negligent design, but under Evans v. General Motors Corp., 359 F.2d 822 (7th Cir. 1966), certiorari denied, 385 U.S. 836, 87 S.Ct. 83, 17 L.Ed.2d 70, and Schemel v. General Motors Corp., 384 F.2d 802 (7th Cir. 1967), certiorari denied, 390 U.S. ——, 88 S.Ct. 1030, 19 L.Ed.2d 1134, there

is ordinarily no duty to design a machine incapable of ever causing injury. Here the separator was reasonably fit for the purpose for which it was made and had no hidden defects at the time of manufacture, so that liability for negligent design is foreclosed by *Evans* and *Schemel;* see also Prosser, Law of Torts (3rd ed.) p. 667.

3. See annotation on "Products Liability—Duty to Warn," 76 A.L.R.2d 9, 16–28; Restatement of the Law of Torts, Second, § 388; Prosser, Law of Torts (3rd ed.), pp. 665–672.

dition, a jury could properly find it negligent. City of Indianapolis v. Willis, 208 Ind. 607, 194 N.E. 343 (1935); Swanson v. Slagal, 212 Ind. 394, 8 N.E.2d 993 (1937). In each of those cases, plaintiff's cause of action for negligence depended in part on failure to warn of a dangerous condition, the issue went to the jury, and the verdict for the plaintiff was sustained by the Indiana Supreme Court. Similarly, in Carmen v. Eli Lilly & Co., 109 Ind. App. 76, 32 N.E.2d 729, 732 (1941), the court acknowledged that "The duty of the appellee [manufacturer] was adequately to warn of the dangers incurred in the use of its said vaccine." There the manufacturer had carefully listed the dangers of the vaccine in an accompanying pamphlet, so that the court held that the jury's finding for the defendant was justified.

In Ilnicki v. Montgomery Ward Co., 371 F.2d 195 (7th Cir. 1966), plaintiff suffered injuries while operating a rotary power lawn-mower purchased from defendant. Plaintiff received no oral warning or instruction. There the District Court ruled that the jury could find the failure to warn to have been negligent (*Ilnicki* Appendix, p. 168). That case was controlled also by Indiana law and supports our conclusion that this jury should have been permitted to consider whether defendant had failed to warn Standard Brands adequately of the danger of an explosion from the deterioration of this coupling ring. Of course, if the jury should find that the danger was obvious or known to the user of the separator or not reasonably foreseeable, there would be no duty to warn. See Thibodaux v. McWane Cast Iron Pipe Company, 381 F.2d 491, 495–497 (5th Cir. 1967); Chicago & Erie R. Co. v. Dinius, 170 Ind. 222, 231, 84 N.E. 9 (1908).

Our study of this record convinces us that a jury could have found that defendant failed adequately to inform Standard Brands that the ring should be replaced when it experienced a certain amount of wear or corrosion. Wood's testimony that he gave such a warning was controverted and might not have been believed. Defendant's instruction booklets were silent on this point, although they did tell purchasers to replace rubber rings. The jury could also have found that defendant did not apprise Standard Brands of how much corrosion could safely be tolerated or that an explosion would result from vertical forces upon failure of the coupling ring. Defendant knew that the use to which the separator would be put was a permissible one; in fact, one of its instruction booklets referred to butter oils, and margarine oil is certainly comparable. In this setting, the Indiana authorities do not support a directed verdict as to Count I, and that phase of the judgment cannot be approved.

Count II is based on implied warranty, alleging that the separator was not fit for its intended purpose by virtue of the "corrosion and wasting" of the coupling ring. The evidence does not support this charge. The ring was made of strong steel and lasted five years and was reasonably suited for its intended use. Since there was no defect in the ring when it left the factory, there could be no breach of implied warranty of fitness. Markwell v. General Tire and Rubber Co., 367 F.2d 748, 749–750 (7th Cir. 1966).[4]

It is true that there was some evidence, hotly contested by defendant, that certain grades of stainless steel would be corrosion resistant and sufficiently strong. However, usually "A manufacturer may determine the character of the materials to be used primarily for the purpose of producing or manufacturing" its product. J. I. Case Co. v. Sandefur, 245 Ind. 213, 197 N.E. 2d 519, 523 (1964); Evans v. General Motors Corp., 359 F.2d 822 (7th Cir. 1966), certiorari denied, 385 U.S. 836, 87

---

4. Defendant cites *Markwell* for the proposition that there is no negligence liability in the absence of a defect. However, none of the three counts in that case was based on negligence. Also, that complaint was not based on failure to warn the buyer.

S.Ct. 83, 17 L.Ed.2d 70. Here the evidence does not show that the coupling ring was "built with extremely weak or flimsy parts concealed by an exterior" (197 N.E.2d at p. 523). Any defect in this coupling ring was not present when it left defendant's factory; it could not be deemed defective simply because it would wear out. Ibid. Since the carbon steel was of merchantable quality and not defective when sold, Count II cannot stand. Prosser, Law of Torts (3rd ed.), pp. 683–684; Restatement of the Law of Torts, Second, § 402 A.

Reversed as to Count I; affirmed as to Count II.