**Paul Allen WEST and Eleanor Juanita West, Appellees,**

v.

**BRODERICK & BASCOM ROPE COMPANY, Appellant.**

**No. 54525.**

Supreme Court of Iowa.

April 13, 1972.

Jones, Hoffmann & Davison, Des Moines, for appellant.

Hawkins, Hedberg & Ward, Des Moines, for appellees.

UHLENHOPP, Justice.

The main problem in this products liability case relates to a manufacturer's duty of care to the ultimate user of a product— in this case, a wire rope sling.

The functions and responsibilities of four groups or entities are involved: workmen in the ironworker craft, their employer, the manufacturer of the sling, and the retail seller of the sling.

The ironworkers of Des Moines, Iowa, are organized in a craft union. Entry into the union is by apprenticeship—working with experienced men and learning the trade. The journeyman ironworker is highly skilled and therefore commands a good wage. One of the articles ironworkers most frequently use is wire rope in various forms including slings. Ironworkers profess to be expert in the use of wire rope, know from experience the size rope to use in particular applications, and realize that worn or damaged rope is dangerous and must be discarded. Their union publishes information on the use and capacity of wire rope. Ironworkers frequently use wire rope to move heavy objects, such as machinery; indeed, because of their specialized knowledge they claim exclusive jurisdiction in the labor field to do that kind of work.

The employer of the ironworkers involved here is Arthur H. Neumann &

Brothers, Inc., an old and experienced Des Moines construction company which has a substantial number of employees. For years Neumann has engaged in moving heavy machinery and is thoroughly familiar with that work.

The manufacturer of the sling in question is Broderick & Bascom Rope Company, which has engaged in that business for nearly a century. Broderick & Bascom has a number of plants and employees, including engineers, and is fully acquainted with the manufacture of wire rope. To control the quality of its rope, it conducts four different tests on wire it receives from suppliers.

The retail seller of the sling involved here is Central Bearings Company, Inc., a long-time Des Moines firm which sells slings and other items of construction equipment. For years, Central Bearings has been a customer of Broderick & Bascom, and Neumann has been a customer of Central Bearings. (Central Bearings was originally a defendant in the case but is no longer a party.)

Wire rope consists of individual wires put together in strands, which in turn are put together to make the rope itself. The rope is made into a multitude of forms, many of which involve danger to personnel and property if the rope is defective or if the workmen use the wrong rope for the task at hand. One of the forms is the sling. A sling is a length of rope with an eye on each end formed by fastening each end of the rope back onto the rope itself.

From long experience and testing, Broderick & Bascom knew quite closely the ultimate breaking point of its rope, called the ultimate tensile strength of the rope. It rated rope in various forms for safe capacity in use. To avoid the possibility of injury to personnel or damage to the rope itself, Broderick & Bascom rated rope for use at one-fifth of its ultimate tensile strength. Rope is not for use beyond its rated capacity. As one witness put it, no one but a fool would use wire rope beyond its rated working capacity.

One size of rope manufactured has a diameter of five-eighths of an inch. The safe working capacity of that rope in the form of a sling is 3.6 tons in a straight pull. Slings are frequently used, however, in a "basket" hitch or a "choker" hitch. In a basket hitch, the sling is thrown over an object, such as a post, and a load is hooked to each eye of the sling or to the two eyes together. If the eyes are close together, the safe working capacity of a ⅝" sling is doubled; it will safely carry or hold 7.2 tons. In a choker hitch, the sling is thrown over the post, one eye is fed into and pulled through the other eye, and the load is hooked to the eye thus pulled through. This application reduces the safe working capacity of the sling by 25% because of the strain on the rope where it contacts the eye through which it is pulled. Thus the safe working capacity of ⅝" rope in a choker hitch is 2.7 tons.

Broderick & Bascom contends and introduced evidence tending to prove that its literature showed these rated capacities, and that it distributed the literature to Central Bearings and the literature reached the hands of the ironworkers; and also that it made metal tags showing rated capacities, and that a tag was fastened to each sling by a ring. But these contentions constitute the battleground in the case on the liability question.

In 1964, Broderick & Bascom manufactured the ⅝" sling involved in this case. The sling was of proper design and was not defective. Broderick & Bascom sold the sling to Central Bearings, which in turn sold it to Neumann. The latter company placed the sling in its equipment warehouse. No records were kept on the sling, but evidently it was placed in use.

In 1965, Firestone Tire & Rubber Company extended the size of its Des Moines tire plant. This necessitated moving several tire presses, each weighing 54½ tons. Neumann contracted to move the presses and sent four journeymen ironworkers to do the work. One of them, foreman Joffer J. Yamen, a journeyman ironworker since 1948 and a foreman for several years, was

thoroughly familiar with the use of slings, the proper size sling for a job, and the danger of using a worn or damaged sling. Another of the ironworkers was plaintiff Paul Allen West, who also was an experienced journeyman. Mr. West had been foreman on some jobs.

Firestone had an engineer on its staff and Neumann had several engineers. But in moving the tire presses, the foreman of the ironworkers was left to his own devices in arranging the rigging and in selecting the size rope. Neither the engineer of the owner, Firestone, nor the engineers of the employer, Neumann, calculated the load involved in pulling and turning the presses or furnished information of that character to the ironworkers. Nor did the ironworkers seek that information. The ironworkers moved the presses over the cement floor by pulling them along on three-inch solid-metal pipes which rolled under the presses. The power for pulling the presses came from a motor of a design which delivered its maximum strength at the outset of a pull.

At one point in moving each tire press to its destination, the ironworkers were required to turn it on its axis. The turning process imposed a considerably greater load on the rigging than a straight pull of a press, for in the turn, the pipes would not simply roll; they also slid to some extent, even though canted. In addition, if the pipes happened to bind or if, as frequently occurs, the rope "jumped" in the eye of a sling, an extra load was thrown on the rigging—called a shock load. A shock load can double the regular load.

The turning process, like the other moving processes, was under the direction of the foreman. In accordance with his directions the ironworkers placed the metal pipes at an angle under the press to make the turn possible. A $\frac{3}{4}''$ wire rope was attached to a corner of the press, run to a sheave (pulley) which was anchored to a post by a $\frac{5}{8}''$ sling in a choker hitch, and then run to the motor at about an 18° angle

to the first line. (In some instances sheaves were anchored to the posts by a multiple wrap of wire rope. This imposed considerably less strain on such rope than the strain imposed on a single sling. The present incident, however, involved the use of a single $\frac{5}{8}''$ sling.) The accompanying sketch illustrates the layout.

The $\frac{3}{4}''$ rope had considerably more strength, of course, than the $\frac{5}{8}''$ rope in the sling. In addition, the $\frac{3}{4}''$ rope, because it consisted of two legs, carried only about half of the amount of load that the single sling carried, and the sling was in a choker hitch reducing its safe working capacity to 2.7 tons. Subsequent engineering computations disclosed that if such a press were turned under ideal conditions—on a smooth granite floor with the three-inch pipes in a perfect radial arrangement—the minimum load on the sling in the turn would be 13 tons. If the pipes were placed as the ironworkers claimed to have put them, and conditions were otherwise ideal, the minimum load would be 15 to 20 tons. Friction from the cement floor would increase the load further, and if a shock load occurred, the load would be upward to double.

The foreman testified he did not know that the safe rated working capacity of the sling was 2.7 tons, that no tag was on the sling indicating its capacity, and that he had not seen literature showing the capacity. He further testified that if he had known that the rated capacity of the sling was 2.7 tons, he would not have used the sling in this application.

Four of the presses were moved over the cement floor, turned, and placed in their destinations. The fifth press was moved over the floor, and the rigging was put in place for the turn. The foreman went around the rigging and checked each sheave. Mr. West was standing between the legs of the $\frac{3}{4}''$ pulling rope near the $\frac{5}{8}''$ sling—in the bight, as it is called. The evidence is meager as to why he was in that dangerous location; the witnesses

HOIST

¾" ROPE

54½ TON PRESS

← 180°

¾" ROPE

⅝" SLING IN CHOKER HITCH

Holding line not shown

[A5718]

agree it is almost "a religion" with ironworkers not to stand in the bight.

The Firestone plant itself was in operation at the time, and the noise in the area was at a high level. After the foreman had checked the rigging, he shouted to get down, he was going to "get up with the load." Mr. West did not hear the foreman. The foreman did not have Mr. West in his line of sight and did not check to see if Mr. West had gotten down or out of the bight. The foreman gave the order to the operator of the motor to get up with the load, and the operator applied the power. In the process, a load far beyond the safe working capacity of the sling, and indeed beyond its ultimate tensile strength, was thrown on the sling. The sling parted, or literally "exploded," according to the witnesses. The rope and sheave shot through the air and struck Mr. West on the head, inflicting grievous permanent injuries. Some of the rigging flew into the air, smashing the lights; part of it struck the press, leaving a large dent in the steel side. Subsequent tests of the components of the sling showed that prior to the incident in question the sling had substantially its ultimate tensile strength (five times rated capacity), notwithstanding it showed signs it had received considerable use and possible misuse previous to this occasion. The sling broke because it was loaded far beyond its rated capacity.

Mr. West commenced the instant damage action for his personal injuries, and his wife asked damages for loss of consortium. The action as it now stands is predicated on negligence on the part of Broderick & Bascom as manufacturer of the sling. Plaintiffs Mr. and Mrs. West originally charged negligence in six specifications, although the last two specifications are really one: Broderick & Bascom negligently (1) designed the rope, (2) manufactured the rope, and (3) assembled the rope. In addition, Broderick & Bascom negligently (4) failed to test the rope and (5 and 6) failed to notify and to warn the users of the rope of its capability, capacity, maintenance, and use.

At trial, no evidence was adduced as to the first three charges. On the contrary, the evidence showed that the rope was properly designed, manufactured, and assembled, and, as stated, that prior to the incident it possessed ultimate tensile strength far in excess of rated capacity. Hence at the conclusion of the evidence, plaintiffs withdrew the first three charges. Broderick & Bascom moved the court to remove the remaining charges, but the motion was overruled and those charges were submitted to the jury. The trial court also submitted to the jury the issue of proximate cause (including the question of whether the negligence of others was the sole or an intervening cause), contributory negligence on the part of Mr. West, and damages. The jury returned substantial verdicts for plaintiffs. Broderick & Bascom appealed.

In its appeal Broderick & Bascom assigns five principal errors, but we find three of them determinative. Did the trial court err in submitting to the jury the negligence charges of (1) failure of Broderick & Bascom to warn users of the rated capacity of the sling and (2) failure to test? (3) Will a rule permitting liability in a case such as this impose an undue burden on interstate commerce?

I. *Failure to Warn.* On the first claimed error—submitting to the jury the issue of failure to warn of the sling's rated capacity—Broderick & Bascom's contentions boil down to three: (a) no duty existed to warn of the safe rated capacity because the sling itself was not inherently or intrinsically dangerous, (b) no duty existed to warn the ironworkers because they themselves were thoroughly familiar with the properties of slings, and (c) no duty existed in any event to warn beyond Broderick & Bascom's immediate vendee, Central Bearings.

(a) As to Broderick & Bascom's contention that no duty to warn existed because

the sling was not inherently or intrinsically dangerous, the language of the law of products liability has been confusing because of events in the development of that field of law. For many years principles of negligence law were confounded with rules of contract law, as a result of the decision in Winterbottom v. Wright, 10 M. & W. 109, 152 Eng.Rep. 402. A requirement of contractual privity was imposed on negligence law in actions against manufacturers.

In extricating themselves from the erroneous imposition of the privity requirement, the courts developed exceptions to that requirement, one of which was for chattels inherently or intrinsically dangerous to personal safety. Prosser, Law of Torts, § 96 at 642 (4th ed.). The next step was the enlargement of that exception by the holding that a chattel is inherently or intrinsically dangerous whenever it imperils human safety if negligently made. MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050. The latest step has been the outright abandonment of the privity requirement and of the rubric of "inherently" or "intrinsically" or "imminently dangerous," in favor of a simple duty of due care based on reasonable foresight in the manufacture and distribution of products. As stated in Restatement, Torts 2d § 395, Comment *a*, "Although some decisions continue to speak the language of 'inherent danger,' it has very largely been superseded by a recognition that what is involved is merely the ordinary duty of reasonable care imposed upon the manufacturer, as to any product which he can reasonably expect to be dangerous if he is negligent in its manufacture or sale." Such has been the direction of the Iowa decisions in products liability cases based on negligence. Rauch v. American Radiator & Standard Sanitary Corp., 252 Iowa 1, 104 N.W.2d 607 (relying on Restatement of Torts); State Farm Mut. Auto Ins. Co. v. Anderson-Weber, Inc., 252 Iowa 1289, 110 N.W.2d 449 (expressly rejecting privity requirement); Calkins v. Sandven, 256 Iowa 682, 129 N.W.2d 1; Wagner v. Lar-

son, 257 Iowa 1202, 136 N.W.2d 312. See Tice v. Wilmington Chemical Corp., 259 Iowa 27, 141 N.W.2d 616; Hawkeye-Security Ins. Co. v. Ford Motor Co., 174 N.W.2d 672 (Iowa).

■ With the rejection of the language of inherent and intrinsic danger, the modern rule regarding the duty to warn is stated thus, and accurately we think, in Restatement, Torts 2d § 388:

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
>
> (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
>
> (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
>
> (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

Section 394 makes § 388 applicable to manufacturers.

■ The question under Broderick & Bascom's first contention, therefore, is not whether the sling could be characterized as inherently or intrinsically dangerous, but whether Broderick & Bascom knew or had reason to know that the sling was or was likely to be dangerous for the use for which it was supplied if warning of working capacity was not given.

True, the sling, hanging in the warehouse, was not dangerous. Nor was it defective. But was it "likely to be dangerous" in its intended use without warning of capacity? The evidence shows that in use

slings are placed in choker hitches around beams to be hoisted and scaffolds to be suspended and, as in this case, around posts to anchor sheaves. Each of these is an intended use and each is fraught with danger. If a sling is loaded beyond its rated capacity and therefore parts, personal injury or death may swiftly follow.

In addition, the expert testimony here clearly indicates the need for warning about the rated capacities of ropes and slings. Broderick & Bascom itself disseminated literature, and contends it tagged slings to show capacities.

The trial court submitted to the jury the question of whether reasonable care required warning of the capacity of the sling (and whether Broderick & Bascom failed to give warning). We think the jury could so find on the evidence presented. Indiana Nat. Bank of Indianapolis v. De Laval Separator Co., 389 F.2d 674 (7th Cir.); McKay v. Upson-Walton Co., 317 F.2d 826 (7th Cir.) (Swygert, J., concurring); Employers' Liability Assur. Corp., Ltd. v. Columbus McKinnon Chain Co., 13 F.2d 128 (W.D.N.Y.); Lovejoy v. Minneapolis-Moline Power Implement Co., 248 Minn. 319, 79 N.W.2d 688. See also Marker v. Universal Oil Products Co., 250 F.2d 603 (10th Cir.); Tomao v. A. P. De Sanno & Son, Inc., 209 F.2d 544 (3d Cir.); Altorfer Bros. Co. v. Green, 236 Ala. 427, 183 So. 415; Martin v. Bengue, Inc., 25 N.J. 359, 136 A.2d 626.

■ In two respects, however, Broderick & Bascom is right in contending that warning was not required. One was with respect to the ultimate tensile strength of a sling. Both the manufacturer and the users intend slings to be used within their safe rated working capacities and not beyond. All realize that using slings beyond rated capacity and toward ultimate tensile strength is an invitation to disaster. The ironworkers here did not intend to transgress the rated capacity, according to their testimony. The evidence shows the foreman would not have used the sling had he

known its rated capacity. Whether sufficient warning was given of that safe rated capacity, not of the ultimate tensile strength, is what this case is really about.

■ Nor was warning required, under the evidence here, with respect to diminution in the rated capacity of a sling from use or misuse. While this sling showed signs of previous use and possible misuse, no warning of reduced capacity was shown to be required because no substantial proof was adduced that the capacity of the sling had in fact been reduced prior to the incident in question. On the contrary, tests of the components of the sling, witnessed by plaintiffs' own expert, showed that the strength of the sling prior to the incident far exceeded its rated capacity and, indeed, that its ultimate tensile strength was substantially that of a new sling. Mr. West was not injured because Broderick & Bascom failed to warn of reduced capacity. He was injured, if plaintiffs' evidence is accepted, by the use of the sling beyond its rated capacity because Broderick & Bascom failed to warn of that capacity.

On Broderick & Bascom's first contention we hold, therefore, that the jury could find a duty existed on Broderick & Bascom's part to warn of the safe rated working capacity of the sling.

(b) Broderick & Bascom's contention that no duty existed to warn of the rated capacity because of the ironworkers' own expertise brings into play § 388(b) of the Restatement of Torts 2d. Paraphrasing, did Broderick & Bascom have reason to believe that those for whose use the sling was supplied would, without a warning, fail to realize the working capacity of the sling?

The question is close. See Frumer & Friedman, Products Liability, §§ 6.02 [3] [b], 6.03 [5] [b] and [d], 8.04, 13.02 (1971). In part of their testimony the ironworkers profess expertise in the use of slings, claim knowledge of the proper size to use, and assert exclusive jurisdiction to perform such work. Their own union furnishes

literature on the rated capacities of ropes and slings. Broderick & Bascom strenuously argues that reasonable care does not require warning to such men.

In other parts of the testimony, however, and in the testimony of the foreman who selected this particular sling, the ironworkers disclaim knowledge of the working capacity of the sling that was employed and say that the sling would not have been used had its rated capacity been known. See Haberly v. Reardon Co., 319 S.W.2d 859 (Mo.).

Moreover, expert witnesses, including one of Broderick & Bascom's own experts, testified that tagging slings with working capacities would certainly be useful information in field operations.

■ We think plaintiffs' case hangs on this close issue. The rule in this jurisdiction is that in determining whether a fact issue is engendered, the evidence is viewed in its most favorable light to the party having the burden of proof, and that if reasonable minds would differ on the issue, it must be left to the trier of the facts. While Broderick & Bascom makes a persuasive argument, we think its argument is for the jury. We are not persuaded we should hold as a matter of law that no duty to warn existed because of the ironworkers' expertise. Eck v. E. I. du Pont de Nemours & Co., 393 F.2d 197 (7th Cir.); McKay v. Upson-Walton Co., 317 F.2d 826 (7th Cir.) (Swygert, J., concurring); Rhoads v. Service Machine Co., 329 F.Supp. 367 (E.D.Ark.); Bean v. Ross Mfg. Co., 344 S.W.2d 18, 24 (Mo.) ("We decline to hold, as a matter of law, that defendant owed him no further duty to warn merely because he was a licensed plumber."); see Note, 1968 Wis.L.Rev. 228, 236.

(c) Was Broderick & Bascom's duty to warn of the sling's rated capacity satisfied by furnishing that information to Central Bearings? The evidence leaves no doubt that Broderick & Bascom did furnish Central Bearings literature containing that in-formation. See generally on this question, Annot., 164 A.L.R. 371; Note, 1967 Wash. U.L.Q. 206.

■ How far down the distributive chain a manufacturer must warn is determined by the general requirement of reasonable care. As stated in Restatement, Torts 2d § 388, Comment n, "Giving to the third person through whom the chattel is supplied all the information necessary to its safe use is not in all cases sufficient to relieve the supplier from liability. It is merely a means by which this information is to be conveyed to those who are to use the chattel. *The question remains whether this method gives a reasonable assurance that the information will reach those whose safety depends upon their having it.*" (Italics added.) See also Noel, Products Defective Because of Inadequate Directions or Warnings, 23 Southwestern L.J. 256, 281 ("the warning must be reasonably calculated to reach such persons [ultimate users], directly or indirectly").

■ Whether reasonable care requires warning beyond the manufacturer's immediate vendee in a particular case depends upon various factors. See Comment n, supra. Among them are the likelihood or unlikelihood that harm will occur if the vendee does not pass on the warning to the ultimate user, the trivial or substantial nature of the probable harm, the probability or improbability that the particular vendee will pass on the warning, and the ease or burden of the giving of warning by the manufacturer to the ultimate user. As stated in Comment n regarding disclosure to the user of the properties of products, "Where the danger involved in the ignorant use of their true quality is great and such means of disclosure are practicable and not unduly burdensome, it may well be that the supplier should be required to adopt them."

■ The evidence here shows that the danger from use of a sling beyond its rated capacity is great, and that Central Bearings made little effort to get information on

rated capacities to ironworkers. The evidence also shows that without great burden, a curved tag, which would not likely be knocked off in service, could be bonded to a depression in the collar of each sling. Broderick & Bascom's own expert, Dr. Leo C. Peters, testified, "I think it's terribly important in the use of the sling in the regular and ordinary course of business for the rated capacity to be on the sling itself. I think it should be there."

■ The trial court submitted this issue, also, to the jury. Cases may arise in which the factors are such that a court may rule as a matter of law the giving of warning to a manufacturer's vendee alone is, or is not, due care. This is not such a case. The trial court properly let the jury say whether reasonable care required that a warning of rated capacity be given to the ultimate users. See Eck v. E. I. du Pont de Nemours & Co., 393 F.2d 197 (7th Cir.). Of course, if a jury finds that warning should be given to the ultimate users, then the requirement is not that the users in fact receive the warning but that the manufacturer employ methods "reasonably calculated" to cause the warning to reach the users. Noel, Products Defective Because of Inadequate Directions or Warnings, 23 Southwestern L.J. 256, 281; Restatement, Torts 2d § 388(c).

We conclude that Broderick & Bascom's first assigned error does not have merit, and that plaintiffs' specification of failure to warn of rated capacity was for the jury. We will say, however, that plaintiffs' specifications of failure to warn and failure to notify of rated capacity amount to the same thing and that both should not have been submitted. Neither should the trial court have submitted the portion of the warning and notification specifications relating to the capability, maintenance, and use of the sling. The evidence relates to failure to warn of rated capacity.

Furthermore, this case does not involve the inadequacy of a warning which is in fact received by an ultimate user. Cases of that kind are inapposite. Under particular facts, courts have held that a manufacturer, in the exercise of due care, should have foreseen an article would be misused or used differently than intended and should have warned against the consequences. Spruill v. Boyle-Midway, Inc., 308 F.2d 79 (4th Cir.) (user read warning on bottle but warning did not inform of toxicity if ingested); Tampa Drug Co. v. Wait, 103 So.2d 603 (Fla.) (same as to breathing carbon tetrochloride fumes); Post v. American Cleaning Equipment Corp., 437 S.W.2d 516 (Ky.) (same as to use of wrong voltage for cleaning fan); Anderson v. Klix Chemical Co., 256 Or. 199, 472 P.2d 806 (same as to injury from cleaning fluid). In the case at bar the complaint is not that the warning in fact given the ironworkers was inadequate. The complaint is that no warning was given them. Moreover, no evidence appears that the ironworkers would have used the sling in excess of rated capacity or differently than intended had they been warned of rated capacity. On the contrary, the foreman testified he would not have used the sling here had he known its rated capacity.

II. *Failure to Test*. Broderick & Bascom contends the trial court erroneously submitted to the jury the negligence charge of failure to test. This assigned error largely turns on the evidence.

■ Failure to test arises in two main factual situations: where adequate tests for defects are not conducted in production and an article containing a defect is marketed, and where the particular article is not defective but the properties of the product in general are not adequately tested before it is released to the public. Here, as with the matter of warning, the duty of the manufacturer is reasonable care. See 1 Frumer & Friedman, Products Liability, § 6.01[1] (1971); Annot., 6 A.L.R.3d 91, 98 See also Rauch v. American Radiator & Standard Sanitary Corp., 252 Iowa 1, 104 N.W.2d 607; Hawkeye-Security Ins. Co. v. Ford Motor Co., 174 N.W.2d 672 (Iowa)

(both involving duty of assembling manufacturer to test parts supplied by others).

As to the first situation—a defect which testing would reveal in a particular article—plaintiffs' evidence fails because it does not show any defect in the sling. The proof is to the contrary. Prior to the incident the sling had strength far beyond rated capacity and substantially the ultimate tensile strength of a new one. Indeed, plaintiffs withdrew their specifications charging that the sling was defective. If an article is not in fact defective, then the matter of testing for a defect in it is not material. Tralli v. Triple X Stores, Inc., 19 Conn.Supp. 293, 112 A.2d 507; Rotche v. Buick Motor Co., 358 Ill. 507, 193 N.E. 529.

As to the second situation—testing to ascertain the properties of a product—the commonest case is one in which a new product such as a compound is launched on the market without adequate testing to ascertain harmful effects when the product is used in various ways. E. I. du Pont de Nemours & Co. v. McCain, 414 F.2d 369 (5th Cir.) (explosive properties of a chemical compound); Gonzalez v. Virginia-Carolina Chemical Co., 239 F.Supp. 567 (E.D.S. C.) (toxicity of crop dust inhaled over prolonged period); Chapman Chemical Co. v. Taylor, 215 Ark. 630, 222 S.W.2d 820 (carrying quality of chemical dust); Maize v. Atlantic Refining Co., 352 Pa. 51, 41 A.2d 850 (fumes of carbon tetrachloride). See Noel, Products Defective Because of Inadequate Directions or Warnings, 23 Southwestern L.J. 256, 265–266; Dillard & Hart, Product Liability: Directions for Use and the Duty to Warn, 41 Va.L.Rev. 145, 159 n. 38 (in these situations "the issue is not how much testing is needed to absolve the manufacturer from negligence in the *manufacturing* process, but the extent necessary to provide a basis for warnings adequate to assure the product's safe use").

The particular property of wire rope slings with which we are concerned here is load capacity. If Broderick & Bascom had put slings on the market without ascertaining their capacity, whereby a workman was injured by loading a sling beyond its strength, a case would be generated on failure to test. But such is not the evidence. From many years of tests, experiments, and experience, Broderick & Bascom knew the safe capacities of its various slings in different configurations. Broderick & Bascom published this information, as did other manufacturers. No evidence was introduced that Broderick & Bascom's published ratings are inaccurate; the proof is that they are accurate. Broderick & Bascom's neglect, if there was neglect, was not in failing to ascertain information on capacities by testing, but in failing adequately to bring that information home to users.

Plaintiffs claim that as a part of the duty to ascertain the properties of slings, Broderick & Bascom was required to test used and misused slings to ascertain their reduced capacities, and then to warn of such reduced capacities. But Broderick & Bascom contends that a manufacturer's duty to test does not extend to deterioration of a product in the field, and also that such tests are entirely unfeasible. We need not decide the point. Plaintiffs' claim necessarily assumes that the capacity of this sling had been reduced by use or misuse in the field.

Failure to test is not material under the circumstances of this case. For testing to be material, substantial evidence must be introduced of a defect in the article—in this case, a decrease in the strength of the sling. But no such evidence was introduced here. On the contrary, the evidence shows the sling possessed substantially the ultimate tensile strength of a new one. The sling parted because of a load beyond such tensile strength.

Moreover, the evidence shows the ironworkers would not have used this sling had they been warned of its rated capacity. Thus the relevant negligence on Broderick & Bascom's part, if there was negligence, was failure to give such warning, not fail-

ure to test. No proof was adduced that the sling did not possess rated capacity.

Failure to test is immaterial here and should not have been submitted to the jury. Submission of this specification was undoubtedly prejudicial. See Cunningham v. Court, 248 Iowa 654, 82 N.W.2d 292.

III. *Burden on Interstate Commerce.* Broderick & Bascom ships ropes and slings throughout the country. It manufactured this sling outside Iowa and shipped the sling into the state. It contends that if this court lays down a rule that a manufacturer can be found liable for failure to warn under the circumstances of this case, an unreasonable burden will be placed on interstate commerce.

The contention is novel, and Broderick & Bascom cites no authority directly in point. Usually unreasonable restraints on interstate commerce are thought of in terms of legislative enactments rather than rules evolved by courts. No basis appears for a distinction, however, and if a court-made rule imposes an unreasonable burden on commerce among the states, presumably it would be as vulnerable to attack as a corresponding statute. See Central of Georgia Ry. v. Mann, 48 Ga.App. 668, 174 S.E. 180 (an instruction to jury claimed to place an undue burden on interstate commerce). If the Iowa legislature enacted into law the same rule of liability for failure to warn that we enunciate in this decision, would the statute be stricken down as imposing an undue burden on commerce between states?

The problem comes under the Commerce Clause of the United States Constitution. Art. I, § 8. Two factors are involved: state laws which *affect* interstate commerce and state laws which *unreasonably* affect such commerce. From an early day the United States Supreme Court has held that, notwithstanding the Constitution gives Congress authority to regulate interstate commerce, the states may enact laws which *affect* such commerce provided the statutes do not discriminate against persons of other states and also provided that Congress has not preempted the field in legislation on the subject. Thus an Indiana statute creating liability for wrongful death was upheld when applied against shipowners engaged in interstate commerce, in Sherlock v. Alling, 93 U.S. 99, 103, 23 L.Ed. 819, 820. The Court said:

It [the Indiana statute] only declares a general principle respecting the liability of all persons within the jurisdiction of the State, for torts resulting in the death of the parties injured. . . . General legislation of this kind, prescribing the liabilities or duties of citizens of a State, without distinction as to pursuit or calling, is not open to any valid objection because it may affect persons engaged in foreign or interstate commerce. Objection might with equal propriety be urged against legislation prescribing the form in which contracts shall be authenticated, or property descend or be distributed on the death of its owner, because applicable to the contracts or estates of persons engaged in such commerce. In conferring upon Congress the regulation of commerce, it was never intended to cut the States off from legislating on all subjects relating to the health, life and safety of their citizens, though the legislation might indirectly affect the commerce of the country.

The Sherlock principle was followed and applied to a foreign corporation in Missouri, K. & T. Ry. v. Haber, 169 U.S. 613, 18 S. Ct. 488, 42 L.Ed. 878 (statutory liability for diseased cattle). Thus we hold that the liability rule we apply in the present case is not invalid merely because it affects interstate commerce. The rule applies to domestic and foreign manufacturers alike, and Congress has not preempted the field by legislation.

The other factor is the nature of the burden imposed on interstate commerce by a state rule of law—whether the burden is *unreasonable*. Practically any state law which touches foreign manufacturers or

dealers burdens interstate commerce to some extent. If manufacturers could ship products into Iowa with no responsibility at all for consequences, they would be considerably less burdened than if subjected by Iowa law to the requirements of § 388 of the Restatement of Torts 2d.

We are not required at this time to analyze the various considerations which determine whether a particular state law unreasonably burdens interstate commerce and is thus beyond the pale. We think the decisions rather clearly indicate that a rule of products liability such as we apply here is within the competence of a state to enact by statute or adopt by decision. Missouri, K. & T. Ry. of Texas v. Harris, 234 U.S. 412, 34 S.Ct. 790, 58 L.Ed. 1377 (state law granting attorney fees applied to persons in interstate commerce); Ziffrin, Inc. v. Reeves, 308 U.S. 132, 60 S.Ct. 163, 84 L.Ed. 128 (confiscation of motor vehicle conveying liquor into state); Swayne & Hoyt, Inc. v. Barsch, 226 F. 581 (9th Cir.) (abolition of defense that negligence was that of foreman); Higgins v. Graham, 143 Cal. 131, 76 P. 898 (creation of period of limitations); Cleveland, C., C. & St. L. Ry. v. Marshall, 182 Ind. 280, 105 N.E. 570 (invalidation of wage assignment not consented to by spouse); Boehm v. Allen, 102 Me. 217, 66 A. 474 (denial of court relief to persons selling liquor); Grimes v. Eddy, 126 Mo. 168, 28 S.W. 756 (imposition of a rule of evidence). We hold that the rule of products liability applied in this case does not impose an unreasonable burden on interstate commerce.

Finally, our conclusion that the trial court erred in submitting failure to test to the jury necessitates a reversal and a new trial. In addition to the three assigned errors we have considered, Broderick & Bascom contends that numerous improper questions were asked during the reception of the testimony and that erroneous rulings were made, largely on points of evidence. Broderick & Bascom also contends that the verdicts are excessive.

We deem consideration of these contentions unnecessary, as the same testimonial interrogation and evidentiary points may not occur on retrial and we do not know what the verdicts will be next time. We will say, however, that we have scrutinized the foundation testimony of plaintiffs' engineer, George Otto, and believe that the trial court was within its discretion in permitting him to testify as an expert. While Mr. Otto's qualifications were not as impressive as those of some of the other expert witnesses, the trial court could properly hold that the matter of his qualifications went to the weight of his opinions rather than to their admissibility.

Reversed.

All Justices concur except REYNOLDSON and HARRIS, JJ., who take no part.